## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| DAWN JAKOMAS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) 2:16-cv-00220 |
| v. | ) |
| | ) |
| CITY OF PITTSBURGH, | ) |
| | ) |
| Defendant. | ) |

## **OPINION**

### **Mark R. Hornak, United States District Judge**

Plaintiff Dawn Jakomas ("Plaintiff") was diagnosed with potentially cancerous tumors and her former employer—the City of Pittsburgh (the "City")—was made aware of that. Though later found to be non-cancerous, Plaintiff's tumors required surgery. Plaintiff took an approximately one-year, City-approved leave from her employment, beginning in February, 2014, for treatment. Plaintiff contends that she was demoted on the day before her leave began, and then filed a Charge of Discrimination with the Equal Employment Opportunity Commission (the "EEOC") against the City while on leave. Upon her return to work in February, 2015, Plaintiff alleges that she was subsequently stripped of additional job duties and responsibilities and subjected to unwarranted disciplinary actions before being terminated from employment by the City in April, 2015.

Plaintiff claims that the City's actions violated the Americans with Disabilities Act, 42 U.S.C. §§ 12101, *et seq.* (the "ADA") (Compl., ECF No. 1). Count I alleges that the City discriminated against Plaintiff due to her medical condition. (*Id.*). Count II alleges that the City

retaliated against Plaintiff for engaging in a protected activity, namely, filing a Charge of Discrimination with the EEOC. (*Id.*).

Now before the Court is the City's Motion for Summary Judgment. (ECF No. 77). The matter has been fully briefed and the Motion is now ripe for disposition. For the reasons that follow, the City's motion will be GRANTED IN PART and DENIED IN PART.

## I.    FACTUAL BACKGROUND

Plaintiff was an at-will employee in the City's Equal Opportunity Review Commission (the "EORC"). (Def.'s Statement of Material Facts in Supp. of Mot. for Summ. J. ("Def.'s SMF") ¶ 1, ECF No. 79). Plaintiff was primarily employed as an Administrator during her employment, but had assumed the duties and responsibilities of an Acting Manager in or about October, 2013, due to a vacancy. (Pl.'s Counter Statement of Facts ("Pl.'s CSF") ¶ 36, ECF No. 86, Pl.'s CSF, Exh. B, ECF No. 86-2). Pursuant to the City's Acting Pay Policy, Plaintiff was paid more while she performed the duties of an Acting Manager. (Def.'s Reply to Pl.'s Counter Statement of Add'l Material Facts ("Def.'s Reply CSF") ¶ 38, ECF No. 92).

Sometime in late 2013 or early 2014, Plaintiff received her diagnosis.[1] Plaintiff's condition required surgical treatment, and Plaintiff commenced an extended medical leave on February 21, 2014, under the Family Medical Leave Act (the "FMLA"), 29 U.S.C. §§ 2601, *et seq.* (Pl.'s CSF ¶ 37; Def.'s Reply CSF, Exh. A at 5–6, ECF No. 94-1). The City was aware of Plaintiff's medical condition prior to her beginning that medical leave. (*Id.*). One day prior to going on leave, on February 20, 2014, the City informed Plaintiff that she would no longer be performing the duties of Acting Manager of the EORC. (Pl.'s CSF ¶ 38). Plaintiff stopped

---

[1] The parties dispute the precise date of Plaintiff's diagnosis. *Compare* Def.'s SMF ¶ 5 (alleging date of diagnosis as February 14, 2014), *with* Dawn Jakomas Dep. ("Jakomas Dep.") at 15:6–15, ECF No. 86-4 (alleging date of diagnosis as September 2013). However, for the purposes of this decision, this dispute is not material. Whether Plaintiff was diagnosed in September, 2013, or February, 2014, neither party disputes that the City was aware of her diagnosis prior to beginning her medical leave in February, 2014.

receiving "acting pay" for her position as Acting Manager on February 21, 2014, (Def.'s SMF ¶ 9), and was relieved of managerial duties and supervisory responsibilities on the same date. (Pl.'s CSF ¶ 38). Plaintiff classifies this action as a demotion. (*Id.*). While on leave, on November 7, 2014, Plaintiff filed a Charge of Discrimination with the EEOC claiming that she was unlawfully discriminated against due to a "perceived disability" of cancer. (Pl.'s SMF, Exh. R, ECF No. 86-20).

Plaintiff returned to work as an Administrator in the EORC on February 9, 2015, without physical restrictions. (Def.'s SMF ¶ 12). On February 10, 2015, Plaintiff met with her supervisor—Ms. Valerie McDonald Roberts—to discuss what Plaintiff characterized as a reduction of her supervisory duties in the EORC office. (*Id.* ¶ 16; Valerie McDonald Roberts Dep. ("VMR Dep.") at 199:9–17, ECF No. 86-9). Upon her return, Plaintiff was also directed by Ms. McDonald Roberts to organize and clean the EORC office, including the offices of two of her subordinates, in order to "assess[] her skills." (VMR Dep. at 113:13–25, 115:13–15; *see also* Dawn Jakomas Dep. ("Jakomas Dep.") at 35:2–24, ECF No. 86-4). Organizing and cleaning the EORC offices are not among the listed duties in the City's job description for the EORC Administrator. (Pl.'s CSF, Exh. T, ECF No. 86-22).

Ms. McDonald Roberts introduced several new and applicable policies for the office on March 3, 2015. (Def.'s SMF ¶ 18). Among these new policies were requirements for employees to sign in to the office no later than 8:30 AM for an 8:00 AM start time, documenting all time out of the office on a calendar that Ms. McDonald Roberts could access, requesting all time off at least forty-eight hours in advance, and providing documentation for any emergency time off. (*Id.*). Plaintiff was made aware of these policies. (*Id.*).

During the final two months of her employment with the City, Plaintiff was disciplined

several times for what the City considered to be various acts of insubordination and failure to

follow office policies. These events (as described by the City) include:

- February 17, 2015 – a verbal reprimand for making false unsubstantiated allegations and personal attacks toward Valerie McDonald Roberts and disrespectful language and behavior.
- March 3, 2015 – a verbal reprimand for false unsubstantiated allegations, disrespectful behavior, and personal attacks toward Valerie McDonald Roberts.
- March 5, 2015 – was not disciplined, but called off work late due to a car accident and did not report to work.
- March 11, 2015 – called off late by twenty minutes for an unscheduled doctor's appointment.
- March 12, 2015 – called off late by seven hours, was instructed to report to the front desk promptly at 8:30 AM with a doctor's excuse for her absences on March 11, 12, and 13.
- March 16, 2015 – a verbal reprimand for insubordination for signing in late.
- March 17, 2015 – a written reprimand for signing in late and exhibiting disrespectful behavior and making false unsubstantiated allegations toward Valerie McDonald Roberts.
- March 18, 2015 – a written reprimand with warning of a one-day suspension for failing to sign in to work and asking another employee to sign in for her.
- March 23, 2015 – a one-day suspension for calling off work to reportedly take her husband to the emergency room and refusing to provide documentation of the incident.
- March 25, 2015 – a three-day suspension for calling off work late and signing in late due to becoming ill in the office parking lot.
- March 30, 2015 – a five-day suspension pending termination for signing in at 8:15 AM but writing 8:00 AM on the sign in sheet, not updating her personal calendar to grant Valerie McDonald Roberts access, not inputting a doctor's appointment on her calendar, and leaving the office without prior approval and without signing out.

(Pl.'s CSF, Exh. 5, ECF No. 86-15). All told, Plaintiff received three progressively more

severe suspensions, culminating in her eventual termination from employment. (Def.'s SMF

¶ 26). Insubordination was at least part of the City's basis for each of the three suspensions. (*Id.*).

On March 31, 2015, the City gave Plaintiff an opportunity to explain why her employment

should not be terminated in response to a five-day suspension pending termination, and Plaintiff

did not provide an explanation. (*Id.* ¶ 28; Pl.'s CSF, Exh. HH, ECF No. 86-36). Plaintiff was

informed via letter dated April 14, 2015, that her employment was terminated as of April 9, 2015. (Pl.'s CSF, Exh. NN, ECF No. 86-42).

## II. STANDARD FOR REVIEW

A court shall grant summary judgment if the movant shows that there is no genuine dispute of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). Summary judgment must be granted "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [her] favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S 242, 255 (1986) (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59 (1970)). But, "[t]he mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252.

The moving party bears the initial burden of demonstrating that there are no genuine disputes of material fact. *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1362 (3d Cir. 1992) (citing *Celotex*, 477 U.S. at 323). If the moving party satisfies this burden, the opposing party must designate specific facts in the record that show that there is a genuine factual dispute to be resolved at trial. *Celotex*, 477 U.S. at 324. The non-moving party may rely on its own affidavits or on the "depositions, answers to interrogatories, and admissions on file" to designate these facts, but may not rely solely on its own pleadings. *Id.*; *see also Williams v. Borough of West Chester*, 891 F.2d 458, 460 (3d Cir. 1989).

## III.   DISCUSSION

Plaintiff asserts that the City discriminated against her in violation of 42 U.S.C. § 12112(a) on two occasions:[2] by demoting her prior to her medical leave beginning in February, 2014, and by reducing her job responsibilities and duties, unjustifiably disciplining her, and firing her after she returned to work in 2015. (Compl.). Plaintiff also contends that the City retaliated against her, in violation of 42 U.S.C. § 12203(a), for filing a Charge of Discrimination while on medical leave. (*Id.*).

The City offers several arguments in response. First, the City contends that Plaintiff did not suffer an adverse employment action for ADA purposes prior to her taking leave in 2014 because she was never demoted, as any then-existing upgrade in pay or responsibilities was inherently temporary per the City's policies. (Def. Br. at 5, ECF No. 78). The City also contends that Plaintiff is unable to establish that she was "regarded as" having a disability, and that the City had legitimate non-discriminatory reasons for terminating Plaintiff's employment in 2015. (*Id.* at 9–17). The City's arguments against the retaliation claim are similar. The City claims that Plaintiff is unable to establish a prima facie case of discrimination, and even if Plaintiff could establish such a prima facie case, Plaintiff fails to demonstrate that the City's legitimate and non-discriminatory reasons for terminating Plaintiff were pretextual. (*Id.* at 18–20). The Court will address each of Plaintiff's claims in turn.

### A. ADA Discrimination Claim – "Demotion" Prior to Taking Leave in 2014

#### a.   Legal standard

In order to present a prima facie case of discrimination under the ADA, a plaintiff must demonstrate "(1) [she] is a disabled person within the meaning of the ADA; (2) [she] is

---

[2] Though Count I alleges one claim of discrimination as to all allegedly adverse employment actions, Plaintiff framed the issue as two distinct events at oral argument. Plaintiff also conceded at oral argument that the questions of whether there are factual disputes regarding the two events need not be answered in the same way.

otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer; and (3) [she] has suffered an otherwise adverse employment decision as a result of discrimination." *Gaul v. Lucent Techs.*, 134 F.3d 576, 580 (3d Cir. 1998). The *McDonnell Douglas* framework where otherwise appropriate applies to discrimination claims under the ADA. *See Wishkin v. Potter*, 476 F.3d 180, 185 (3d Cir. 2007). Once a plaintiff establishes a prima facie case of discrimination, the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for the employment action. *Id.* (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 793–94 (1973)). If the employer successfully meets this burden, the plaintiff may then have the opportunity to show that the employer's stated reasons are pretextual. *Id.* A plaintiff may survive a motion for summary judgment if she can discredit the employer's proffered reasons for taking the adverse action, or if she can adduce sufficient direct or circumstantial evidence that "discrimination was more likely than not a motivating or determinative cause of the adverse employment action." *Id.* (quoting *Fuentes v. Perskie*, 32 F.3d 759, 762 (3d Cir. 1994)).

Neither party disputes that Plaintiff was otherwise qualified to perform the essential functions of the job. (Def.'s SMF ¶ 12). Defendant submits that Plaintiff's ADA discrimination claim stemming from her "demotion" in 2014 fails because 1) Plaintiff was not a disabled person within the meaning of the ADA and was never "regarded as" having a disability by the City; and 2) Plaintiff suffered no adverse employment action after being relieved of her Acting Manager duties in 2014.

### b. Plaintiff did not suffer an adverse employment action in 2014.

"[A]n adverse employment action is one which is serious and tangible enough to alter an employee's compensation, terms, conditions, or privileges of employment." *Cardenas v. Massey*,

269 F.3d 251, 263 (3d Cir. 2001) (internal quotations omitted). When an employee's salary, reporting requirements, and general duties remain the same, there is typically insufficient evidence of an adverse employment action. *Fiorentini v. William Penn Sch. Dist.*, 150 F. Supp. 3d 559, 567 (E.D. Pa. 2016). However, a change in employment status, responsibilities, or duties that does not result in a reduction of pay and/or benefits may nonetheless qualify as an adverse employment action. *Dilenno v. Goodwill Indus. of Mid-Eastern Pa.*, 162 F.3d 235, 236 (3d Cir. 1998). The core inquiry is whether a reasonable jury could determine that the employee's employment was substantially worsened. *Id.* at 236; *see also Bearley v. Friendly Ice Cream Corp.*, 322 F. Supp. 2d 563, 577 (M.D. Pa. 2004) (concluding that a reasonable jury could find that a transfer from a bookkeeping position to a food preparation position was an adverse employment action because it would "likely involve different working conditions, status, skill, and authority").

Plaintiff characterizes the cessation of her increased salary under the City's Acting Pay Policy on February 20, 2014, as a "demotion" and an adverse employment action. The City contends that Plaintiff had only been given and accepted additional managerial responsibilities on a temporary basis. Thus, in the City's view, Plaintiff was not demoted when she was told she would no longer be the Acting Manager, and therefore did not suffer an adverse employment action. The City further submits that Plaintiff was aware that she was to be compensated at a managerial level on a temporary basis, per the City's Acting Pay Policy. In the City's view, Plaintiff merely reverted to her typical and regular job and salary when her Acting Manager status was relinquished prior to Plaintiff beginning her medical leave.

On this issue, the Court agrees with the City. While a demotion and subsequent reduction of pay would qualify as an adverse employment action in the ordinary course, *see, e.g.*, *Jones v.*

*Sch. Dist. of Phila.*, 198 F.3d 403, 411 (3d Cir. 1999), the Court agrees with the City in that the record here points in only one direction—Plaintiff was never promoted in the first place. The record is clear that both the City and Plaintiff understood Plaintiff's assumption of managerial duties at the EORC—and corresponding salary increase—to be temporary. The City's Acting Pay Policy, of which Plaintiff was aware, explicitly states as much. *See Escamilla v. Kirk*, No. 5:05-CV-164, 2007 WL 689860, at *5 (W.D. Mich. Mar. 2, 2007) (holding that a reversion of plaintiff's temporary position to her permanent position, and corresponding reversion to her previous lower salary, was not an adverse employment action because the plaintiff knew that the position was temporary). Plaintiff assumed additional duties, was compensated accordingly, and then reverted back to the *status quo ante* when the City later determined that the EORC did not require a manager position. Plaintiff was no worse off than she was prior to temporarily assuming the Acting Manager duties, and nothing in the record indicates that Plaintiff was entitled to (or had a basis to reasonably believe that she would receive) a permanent promotion.[3] *Cf. Sanders v. Nicholson*, 316 F. App'x 161, 165 (3d Cir. 2009) (holding that expiration of plaintiff's temporary position could be an adverse employment action because there was some evidence that the employer may have promised to hire plaintiff permanently, or extend his temporary position, at the expiration of the position).

In a case such as this, where an employee receives a temporary promotion and then reverts back to her original position, courts have consistently held that this reversion is not an adverse employment action. *See, e.g., Harrison v. U.S. Postal Serv.*, 450 F. App'x 38, 41–42 (2d Cir. 2011); *Forkkio v. Tanoue*, 131 F. Supp. 2d 36, 42–43 (D.D.C. 2001), *aff'd*, 306 F.3d 1127 (D.C. Cir. 2002); *McClamb v. Rubin*, 932 F. Supp. 706, 715 (M.D.N.C. 1996); *Atkins v. Boeing*

---

[3] The characterization of Plaintiff as the "Acting Manager" further undercuts her argument. "Acting," as an adjective, is defined as "serving temporarily, especially as a substitute during another's absence; not permanent; temporary." Dictionary.com, https://www.dictionary.com/browse/acting (last visited Oct. 16, 2018).

*Co.*, No. 91-1404, 1993 WL 186170, at *7 (D. Kan. May 5, 1993), *aff'd*, No. 93-3177, 1994 WL 274066 (10th Cir. June 14, 1994). That principle applies here. Plaintiff received an advantageous employment action by temporarily assuming additional duties with additional pay. But the discontinuation of an advantageous employment situation is not an adverse employment action, where, as here, the employee is aware that the advantageous situation is temporary.

Accordingly, the Court concludes that Plaintiff is unable to establish a prima facie case of discrimination under the ADA in regard to the alleged demotion in 2014 because Plaintiff is unable to establish that she suffered an adverse employment action.

## B. ADA Discrimination – The 2015 Claims

Plaintiff was fired by the City on April 9, 2015. (Pl.'s CSF, Exh. NN, ECF No. 86-42). Obviously, this was an adverse employment action. Plaintiff was cleared to return to work in 2015 without physical restrictions, and neither party disputes that Plaintiff was "otherwise qualified to perform the essential functions of the job." *Gaul*, 134 F.3d at 580. The City argues that Plaintiff cannot establish a prima facie case of ADA-covered discrimination because 1) she was not "a disabled person within the meaning of the ADA," and; 2) Plaintiff did not suffer an adverse employment action "as a result of discrimination." *See id.* The parties also dispute whether the additional actions taken by the City following Plaintiff's return to work in February, 2015, qualify as adverse employment actions under the ADA.

### a. Plaintiff suffered an adverse employment action when her job duties were altered after returning from medical leave.

The City does not dispute that Plaintiff suffered an adverse employment action when her employment was terminated in April, 2015. The City also concedes that Plaintiff received adverse employment actions when she was formally disciplined for insubordination. (Def. Br. at 19). Plaintiff additionally characterizes the City "significantly chang[ing]" Plaintiff's position

- 10 -

and the City's "continuous course of conduct" after Plaintiff returned to work in February, 2015 as adverse employment actions. (Pl. Br. at 8, ECF No. 87). The Court agrees that a jury could so find.

As discussed above, a change in employment status, responsibilities, or duties—even without a reduction in pay—may qualify as an adverse employment action. *Dilenno*, 162 F.3d at 236. When she returned to duty in 2015, Plaintiff was instructed that she would be responsible for organizing and cleaning the EORC office,[4] despite such tasks not being part of her position as an Administrator. The record also suggests that many of Plaintiff's residual supervisory responsibilities and authority were eliminated when she returned from leave. (VMR Dep. at 199:10–203:7). Even Ms. McDonald Roberts conceded that it was "not unreasonable" for Plaintiff to be "unhappy" that her duties at the time were "much less than her previous duties." (*Id.* at 200:8–200:15). A reasonable factfinder could conclude that directing Plaintiff to perform relatively menial tasks, and otherwise meaningfully reducing her responsibilities, would "involve different working conditions, status, skill, and authority" so as to permit a jury to conclude that they were adverse employment actions. *See Bearley*, 322 F. Supp. 2d at 577.

### b. Plaintiff may have been "regarded as" disabled.

Under the ADA, a person is "disabled" if she has "a physical or mental impairment that substantially limits one or more major life activities of such individual; a record of such an impairment; or [is] *regarded as* having such an impairment." 42 U.S.C. § 12102(1) (emphasis added). A "major life activity" includes "working." 42 U.S.C. § 12102(2)(A). Plaintiff concedes that she did not then have an actual physical or mental impairment so as to qualify her as

---

[4] This event has in the Court's estimation been both overplayed and underplayed by the Plaintiff and the City, respectively. It does not appear that this was a persistent or continuing duty, so it is not (much) evidence that Plaintiff was, as she argues, reduced to being a "glorified janitor." Pl.'s CSF ¶ 65. At the same time, considered in the context of all that went on when Plaintiff returned to duty (including Ms. McDonald Roberts reason for assigning the task to Plaintiff) it was not, as the City contends, nothing.

"disabled." However, Plaintiff argues she was nonetheless a disabled person within the meaning of the ADA because she was "regarded as" being disabled by the City in 2015. (Jakomas Dep. at 7:13–25).

Congress amended the ADA in 2008 via The ADA Amendments Act of 2008, Pub. L. No. 110– 325, 122 Stat. 3553 (the "ADAAA"). In doing so, the following language was added in order to clarify what it meant to be "regarded as having such an impairment":

> For the purposes of [42 U.S.C. § 12102] (1)(C):
>
> (A) An individual meets the requirement of "being regarded as having such an impairment" if the individual establishes that he or she has been subjected to an action prohibited under this chapter because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity.
>
> (B) Paragraph (1)(C) shall not apply to impairments that are transitory and minor. A transitory impairment is an impairment with an actual or expected duration of 6 months or less.

42 U.S.C. § 12102(3). Plaintiff argues that following this amendment, a plaintiff proceeding under the "regarded as" prong of the statute no longer must show that she has an impairment that substantially limits a major life activity. This Court agrees, based on a plain reading of the statute, and Defendant does not seriously contend otherwise. *See also Kelly v. Drexel Univ.*, 94 F.3d 102, 109 (3d Cir. 1996) ("Our analysis of this claim focuses not on [Plaintiff] and [her] actual abilities, but rather on the reactions and perceptions of the persons interacting or working with [her].").

The main point of contention is what a plaintiff must demonstrate in order to survive summary judgment in a "regarded as" case following the 2008 amendments to the ADA. Plaintiff argues that a plaintiff need only demonstrate that an employer was aware of an alleged impairment to overcome a summary judgment challenge to a "regarded as" claim. The City

contends otherwise, arguing that employer awareness of an actual or perceived impairment, without more, is insufficient to survive summary judgment. The Third Circuit has not issued a precedential opinion on this issue in a case that applies post-ADAAA law. Prior to the ADAAA, the Third Circuit explicitly held that "the mere fact that an employer is aware of an employee's impairment is insufficient to demonstrate either that the employer regarded the employee as disabled or that the perception caused the adverse employment action." *Kelly*, 94 F.3d at 109. Plaintiff argues that this holding was statutorily superseded by the ADAAA. The City, not surprisingly, asserts that this holding remains controlling law in this Circuit.

Both parties cite relevant authority in support of their position. Plaintiff chiefly relies on *Rubano v. Farrell Area Sch. Dist.*, 991 F. Supp. 2d 678, 692–93 (W.D. Pa. 2014). *Rubano* held that "[a]fter the 2008 amendments to the ADA . . . all that an ADA plaintiff must show to raise a genuine issue of material fact for the "regarded as" prong is that a supervisor knew of the purported disability." *Id.* at 693 (citing *Mengel v. Reading Eagle Co.*, No. 11-6151, 2013 WL 1285477, at *4 (E.D. Pa. Mar. 29, 2013)); *accord Estate of Murray v. UHS of Fairmount, Inc.*, No. 10-2561, 2011 WL 5449364, at *8 n.18 (E.D. Pa. Nov. 10, 2011) (distinguishing the more stringent standard in *Sulima v. Tobyhanna Army Depot*, 602 F.3d 177 (3d Cir. 2010) because "*Sulima* applie[d] pre-ADAAA law"). The City chiefly relies on a non-precedential Third Circuit opinion, *Cunningham v. Nordisk*, 615 F. App'x 97, 100–01 (3d Cir. 2015), and a case from the Middle District of Pennsylvania that criticized the reasoning in *Rubano*, *Baughman v. Cheung Enters., LLC*, No. 1:13-CV-1511, 2014 WL 4437545, at *12 (M.D. Pa. Sept. 9, 2014). In *Cunningham*, the Third Circuit noted that the plaintiff's "supervisor and some co-workers were aware of her medical condition" but held that she "did not provide any evidence that they regarded her as disabled." 615 F. App'x at 100. And, *Baughman* specifically criticized *Rubano*

for applying a "far too lenient" standard in analyzing the "regarded as" prong. 2014 WL 4437545, at *12.

It is unsettled whether *Kelly* remains good law on this issue after the ADAAA. Despite the *Rubano* court holding to the contrary, other courts in this District continue to cite to the precedential *Kelly* decision favorably in their analysis of "regarded as" claims. *See Schirnhofer v. Premier Comp Solutions, LLC*, 303 F. Supp. 3d 353, 370 n.9 (W.D. Pa. 2018); *Litzinger v. Allegheny Lutheran Social Ministries*, No. 3:15-cv-306, 2017 WL 3089022, at *7 (W.D. Pa. July 20, 2017).[5] Other courts appear to be split on this issue. *Compare, e.g.*, *Kiniropoulos v. Northampton Cty. Child Welfare Serv.*, 917 F. Supp. 2d 377, 386 (E.D. Pa. 2013) (citing *Kelly* favorably in a case applying post-ADAAA law), *with Mengel*, 2013 WL 1285477 at *4 ("The decision makers . . . were aware that [plaintiff] had balance problems related to her brain tumor surgery . . .[t]his is sufficient to show that she may have been regarded as disabled.").

The issue is whether *Kelly* retains its precedential force on this point in light of the intervening amendments to the ADA. This Court is, of course, bound by the precedential decisions of the Third Circuit. *E.g.*, *Cyclops Corp. v. United States*, 408 F. Supp. 1287, 1291 (W.D. Pa. 1976). And, "*stare decisis* carries enhanced force when a decision . . . interprets a statute." *Kimble v. Marvel Entm't, LLC*, 135 S. Ct. 2409, 2409 (2015). But this is only so because "Congress can correct any mistake it sees" in a judicial interpretation and eliminate it from the statutory scheme. *Id.* That is, Congress can indicate that it intends to alter an established understanding of what a law means if it uses clear language to that effect. *See Emerson Elec. Supply Co. v. Estes Express Lines Corp.*, 451 F.3d 179, 187 (3d Cir. 2006); *see also Hayes v. Harvey*, — F.3d — , 2018 WL 4171034 (3d Cir. Aug. 31, 2018) ("When Congress amends

---

[5] Because it appears that the parties did not raise the issue, the Court in *Litzinger* did not address the impact or implication of the ADAAA, 2017 WL 3089022 at *7, nor did the *Schirnhofer* Court. 303 F. Supp. 3d at 370.

legislation, courts must presume it intends [the change] to have real and substantial effect.")
(citing *Ross v. Blake*, 136 S. Ct. 1850, 1858 (2016) (internal quotation marks omitted, alterations
in original).[6]

The Court concludes that Congress, through enacting the ADAAA, intended to alter the
existing judicial interpretations of "regarded as" claims under the ADA. First, the ADAAA itself
states as much. *See, e.g.*, ADA Amendments Act of 2008, Pub. L. No. 110– 325, 122 Stat. 3553
§ 2(b)(3) (stating that a purpose of the Act is to reject the Supreme Court's narrow view of
"regarded as" claims and reinstate a broad view of these claims). Further, the statutory definition
of "being regarded as having such an impairment", codified at 42 U.S.C. § 12102(3), was added
by the ADAAA post-*Kelly*, was not interpreted by the *Kelly* court, and has not yet been
construed by the Third Circuit in a precedential opinion.[7] As additional language that clarifies
the intended scope of "regarded as" claims, this subsequent legislation is "entitled to great
weight in statutory construction." *See Red Lion Broadcasting Co. v. FCC*, 395 U.S. 367, 380–81
(1969). Simply put, the Third Circuit in *Kelly* interpreted a provision of the ADA that has since
been materially altered by the intervening ADAAA amendments, and Congress's intention to
reject narrower judicial interpretations of "regarded as" claims confirms this conclusion. Thus,
the Court concludes that the narrower view of "regarded as" claims announced by the Third

---

[6] Similarly, even though the Third Circuit is "generally bound by [its] prior decisions" it "may reevaluate a
precedent in light of intervening authority and amendments to statutes or regulations," even when not sitting *en
banc*. *See United States v. Savani*, 733 F.3d 56, 62 (3d Cir. 2013) (internal quotations and citations omitted).

[7] Moreover, the Third Circuit did not cite to or purport to apply 42 U.S.C. § 12102(3) in *Cunningham*, nor did the
Third Circuit cite to *Kelly* in its *Cunningham* Opinion. And, as an unpublished opinion, the *Cunningham* decision is
not binding precedent on this Court. *E.g.*, *Fallon Elec. Co., Inc. v. Cincinnati Ins. Co.*, 121 F.3d 125, 128 n.1 (3d
Cir. 1997).

Circuit in *Kelly* is not controlling on the question here, and was statutorily superseded by the ADAAA through the clarifying language of 42 U.S.C. § 12102(3).[8]

The City does not attempt to distinguish *Rubano* or argue against its application, but rather asks this Court to consider it to be an outlier case that misinterpreted the import of the ADAAA amendments. (Def. Br. at 11). As noted, the Middle District of Pennsylvania has taken this position in *Baughman*. The Court, however, does not agree.[9] The text of the statute is plain in that any "actual or perceived physical or mental impairment" can be the basis for a "regarded as" claim "whether or not the impairment limits *or is perceived to limit* a major life activity." 42 U.S.C. § 12102(3)(A) (emphasis added). Demonstrating awareness of an impairment would be sufficient to support an inference of a perception of the same.[10] And as noted below, the record here reveals more than an awareness, since the record evidence is that when Plaintiff returned to work from an approved medical leave, she was assigned certain tasks in order to assess her fitness for duty. That would in the Court's estimation further support the inference that the City's managers actually perceived her as being disabled.

---

[8] Other Circuits have reached similar conclusions regarding the ADAAA's effect on "regarded as" claims. *See, e.g.*, *Adair v. City of Muskogee*, 823 F.3d 1297, 1306 (10th Cir. 2016) ("Under the ADAAA . . . the plaintiff must show that (1) he has an actual or perceived impairment, (2) that impairment is neither transitory nor minor, and (3) the employer was aware of and therefore perceived the impairment at the time of the alleged discriminatory action."); *Burton v. Freescale Semiconductor, Inc.*, 798 F.3d 222, 230 (5th Cir. 2015) ("[Plaintiff] need only show that her employer perceived her as having an impairment and that it discriminated against her on that basis.") (internal quotations omitted); *EEOC v. BNSF Ry. Co.*, No. 16-35457, at 14 (9th Cir. Sept. 12, 2018).

[9] The Court also notes that a number of other district courts have cited *Rubano* favorably as persuasive authority and adopted similar or identical standards for evaluating "regarded as" claims under the ADAAA at the summary judgment phase. *See Cooper v. CLP Corp.*, No. 13-cv-02152, 2015 WL 9311964, at *4–5 (N.D. Ala. Dec. 23, 2015); *Palish*, 2014 WL 2692489 at *9; *Riley v. St. Mary Med. Ctr.*, No. 13-CV-7205, 2014 WL 2207347, at *2–3 (E.D. Pa. May 28, 2014; *Powell v. Gentiva Health Servs., Inc.*, No. 13-0007, 2014 WL 554155, at *7 n.14 (S.D. Ala. Feb. 12, 2014).

[10] Even the *Kelly* court appears to have equated perception of a condition with awareness. *See* 94 F.3d at 109 ("[T]he mere fact that an employer is aware of an employee's impairment is insufficient to demonstrate either that the employer regarded the employee as disabled or that that perception caused the adverse action.") (emphasis added).

Of course, the individual must *also* "establish[] that he or she has been subjected to an action prohibited under this chapter *because of*" such an impairment. *Id.* (emphasis added). A plain reading of the statute explains that awareness of a disability or impairment alone is not enough to survive summary judgment on a "regarded as" claim. Rather, a plaintiff must also produce sufficient evidence such that a factfinder could reasonably infer that the employer engaged in the prohibited action because of an actual or perceived impairment. The ADAAA did not alter this causation element of a plaintiff's prima facie case. Employer awareness of an employee's impairment alone, coupled only with the fact of an adverse employment action, is insufficient to survive summary judgment.[11]

*Rubano* itself is instructive in this regard, and is not an "erroneous" case as the City suggests. The court in *Rubano* determined that the plaintiff raised a genuine dispute of material fact regarding whether he was "regarded as" being disabled by demonstrating that his employer was aware of his mental impairment. 991 F. Supp. 2d at 693. However, the *Rubano* court was also very clear that this only satisfied one element of the plaintiff's prima facie case. *Id.* at 699– 700. The court also noted that the plaintiff was demoted, dissuaded from applying for new job opportunities, given reduced overtime opportunities, stripped of certain responsibilities, and had his mail withheld by his employer. *Id.* at 694–98. The defendant school district in *Rubano* provided alternative explanations for any potential harassment that the plaintiff experienced before and after taking medical leave from his position. *Id.* at 700–01. The district argued that the plaintiff "failed to identify a single piece of direct evidence to link his alleged harassment to his disability" and also did not "produc[e] indirect evidence from which a reasonable factfinder

---

[11] The parties in their briefs conflate the "causation" element of a plaintiff's prima facie case and the burden to satisfy the "regarded as" prong under the ADA. The statute itself also seems to at minimum combine the two requirements. *See* 42 U.S.C. § 12102(3)(A). Satisfying the "regarded as" prong (i.e., § 12102(3)(A)) requires establishing both elements. That is, to plead and prove a prima facie case under the "regarded as" prong (§ 12102(3)(A)), a plaintiff must establish that she was "regarded as" being disabled *and* that "he or she was has been subjected to an action prohibited under this Act *because of*" that perception. 42 U.S.C. § 12102(3)(A).

could conclude that the facially neutral harassment stemmed from his disability." *Id.* at 700. The court agreed and granted summary judgment on the ADA discrimination claims in favor of the defendant school district. *Id.* at 701. According to the *Rubano* court, even if the plaintiff was "singled out" and treated poorly by a supervisor following his FMLA leave for depression, the plaintiff did not produce any evidence that this treatment was *because of* a disability, actual or perceived. *Id.* at 701 (citing *Walton v. Mental Health Ass'n of S.E. Pa.*, 168 F.3d 661, 667 (3d Cir. 1999) ("A personality conflict doesn't ripen into an ADA claim simply because one of the parties has a disability.") (internal quotations omitted)).

*Mengel* is similar. There, the court also determined that the plaintiff produced sufficient evidence that she may have been regarded as disabled due to employer awareness of the plaintiff's condition. 2013 WL 1285477 at *4. But, as in *Rubano*, the court found evidence of causation to be lacking. *Id.* ("Ms. Mengel has not produced evidence of a causal link between her alleged disabilities and her termination."). The court cited evidence of a two-year passage of time between the onset of her impairments and her termination, absence of any other evidence suggesting that her employer had considered her impairments, and a satisfactory performance evaluation after a surgery to refute any suggestion that the plaintiff was fired because of an actual or perceived disability. *Id.*

Plaintiff cites only one case in which a plaintiff survived a motion for summary judgment under its proposed rule: *Palish v. K&K RX Servs., L.P.*, No. 13-cv-4092, 2014 U.S. Dist. LEXIS 80606 (E.D. Pa. June 12, 2014). That case is not only consistent with *Mengel* and *Rubano*, but is also inapposite to the instant case. In *Palish*, the defendant did not contest the causation element of the plaintiff's prima facie ADA discrimination case. *Id.* at *28. Thus, the court needed only to determine whether there was sufficient evidence to infer that, under post-ADAAA law, the

- 18 -

employer regarded the employee as disabled, and held that this can be satisfied at the summary judgment stage by showing that the employer was aware of the employee's impairment. *See id.* at *29.

The Court concludes that in enacting the ADAAA, Congress modified the rule as applied in *Kelly* such that employer knowledge of an individual's impairment is sufficient to create a material factual dispute as to whether the employer "regarded" the individual as disabled. The Court also notes that it does not consider this determination to be particularly momentous in this case or cases like it, and emphasizes that, even when a plaintiff is "regarded as" disabled, the plaintiff "must provide evidence that supports a logical inference of causation between the alleged disability and the adverse employment action and/or harassment." *Rubano*, 991 F. Supp. 2d at 700 (quoting *Mengel*, 2013 WL 1285477 at *4) (internal quotation marks and citations omitted). The real dispute (and substantially more onerous burden for the plaintiff) is whether there is sufficient record evidence that the City took an adverse employment action against Plaintiff *because of* any perceived disability. Nothing about the ADAAA altered that requirement of a plaintiff's prima facie case, and the burden remains on a plaintiff to establish such a causal nexus.[12]

### c.  Plaintiff has raised a material factual dispute regarding causation.

It is beyond dispute that the City was aware of Plaintiff's medical condition in early 2014. Plaintiff told several colleagues of her diagnosis and took a lengthy medical leave for treatment. Ms. McDonald Roberts gave an interview, while Plaintiff was on leave, in which she

---

[12] The Middle District of Pennsylvania suggested in *Baughman* that the *Rubano* approach would mean that any employee could "become protected by the ADA by simply announcing to his or her supervisor that he or she has an impairment." *Baughman*, 2014 WL 4437545 at *12. But even if "awareness" brings a plaintiff under the ADA umbrella, that is the beginning and not the end of the road. An employee still retains the burden of proving that the knowledge and perceptions of her employee caused the employer to make an adverse employment decision. *Rubano* and *Mengel* each illustrate that "simply announcing" a disability or impairment to a supervisor is far from sufficient to guarantee ADA insulation from the consequences of an adverse employment action.

mentioned Plaintiff's medical leave. (Pl's CSF, Exh. Q, ECF No. 86-19). However, it is less clear what the City knew about Plaintiff's condition following her return to work in 2015. Plaintiff returned to work without stated physical limitations, so one reasonable inference is that the City could conclude that Plaintiff was no longer suffering from her medical condition. But, in March, 2015, Plaintiff told Ms. McDonald Roberts and Debbie Lestitian, Chief of Human Resources at the City, that she still had a "breast disease." (Jakomas Dep. at 43:17–44:24; Debbie Lestitian Dep. at 19:15–20:25, ECF No. 86-30). And, Plaintiff applied for another FMLA leave on March 30, 2015, for anxiety and stress. (Pl.'s CSF, Exh. KK, ECF No. 86-39).[13] In sum, there is sufficient record evidence from which a reasonable factfinder could conclude that the City was aware of and had reason to believe that Plaintiff continued to suffer from a medical condition following her return to work in 2015.

Plaintiff contends that the City engaged in a pattern of unlawful conduct following her return to work on February 20, 2015, which culminated in her termination in April, 2015. Namely, Plaintiff alleges that she was singled out and subjected to unjustified punishments, stripped of her duties and responsibilities as an Administrator, ordered to clean and organize the EORC office, and eventually terminated. (Pl.'s CSF ¶¶ 51–86, Exh. NN, ECF No. 86-39).

The City paints a different picture of Plaintiff's final two months of employment. The City claims that Plaintiff was fired from her position following a series of insubordinate acts and progressively increasing suspensions. (Def. Br. at 12). These incidents were detailed above and need not be fully recounted here. Plaintiff herself, at oral argument, did not dispute that she broke the office rules, but mainly takes issue with the City's response to these infractions. The City, on the other hand, believes that it was patient with Plaintiff and chose to progressively warn

---

[13] The record does not indicate whether this request was granted. Plaintiff received a letter from Valerie McDonald Roberts the following day (March 31, 2015) informing Plaintiff that she was being suspended for five days pending her termination. (Pl.'s CSF, Exh. HH, ECF No. 86-36).

and discipline her rather than to terminate her at the first instance of insubordination. In essence, the City asserts that Plaintiff was fired for her insubordination and nothing more. According to the City, the fact that the City was at one time aware of Plaintiff's medical condition and lengthy medical leave did not bear in any way on the City's decision to terminate Plaintiff's employment, and it is entitled to judgment in its favor as a matter of law.

The City cites *Reinhart v. Mineral Techs. Inc.*, No. 05-4203, 2006 WL 4050695 (E.D. Pa. Aug. 8, 2005) in support of its position. In *Reinhart*, an employee was terminated following a series of progressive disciplinary actions in response to outbursts directed at his supervisors and other aggressive behavior. *Id.* at *1–*4. In granting summary judgment for the employer, the court explained that "although the ADA prevents an employer from discharging an employee based on his disability, it does not prevent an employer from discharging an employee for misconduct, even if that misconduct is related to his disability." *Id.* at *9 (collecting cases). However, the Court notes that the alleged misconduct in *Reinhart* was of a different kind and degree than the instant case. For example, the plaintiff in *Reinhart* was disciplined for several heated verbal altercations and arguments with coworkers and supervisors in which "foul language and screaming" was used, and for directing a racially charged statement toward a former supervisor on at least one occasion. *See id.* at *1–*4. Importantly, this conduct occurred over an approximately two-and-a-half-year period. *Id.* So, while the Court appreciates the reasoning in *Reinhart*, the Court notes that the case is a poor factual analog mainly because Plaintiff's alleged misconduct (and the City's responses) was compressed into a relatively short time frame after her 2015 return to work and the November, 2014, filing of her EEOC Charge.

Plaintiff was undeniably treated differently by the City, and particularly Ms. McDonald Roberts, following her return to work in February, 2015. Plaintiff returned to work to find her

- 21 -

job responsibilities reduced significantly, and being tasked with cleaning and organizing the EORC office (on at least one occasion) in order to "assess her skills." Plaintiff received significant sanctions for what she says should be fairly viewed as relatively minor misconduct when new rules relative to office conduct were instituted around the same time. (Pl.'s CSF, Exh. Y, ECF No. 86-27). And, obviously, Plaintiff was eventually fired by the City two months after returning from leave. Plaintiff has produced sufficient evidence such that a reasonable factfinder could conclude that she and Ms. McDonald Roberts had a contentious relationship. Plaintiff, at her deposition, recalled being "embarrass[ed]" and "humiliate[ed]" by Ms. McDonald Roberts, being told not to speak in meetings, and stated that her anxiety "was a mess." (Jakomas Dep. at 41:6–44:25). Plaintiff blamed McDonald Roberts for her anxiety and alleged that McDonald Roberts was unconcerned with her well-being.[14] (*Id.*). It may very well be true that Ms. McDonald Roberts did not like Plaintiff, and there may even be evidence that Ms. McDonald Roberts was harsh with Plaintiff at an interpersonal level. But, "a personality conflict doesn't ripen into an ADA claim simply because one of the parties has a disability." *Walton*, 168 F.3d at 667 (internal quotation omitted). Rather, the dispositive consideration is whether Plaintiff has "provide[d] evidence that supports a logical inference of causation between the alleged disability and the adverse employment action." *Rubano*, 991 F. Supp. 2d at 700.

The Court concludes that Plaintiff has made such a showing. Unlike the plaintiff in *Rubano*, Plaintiff's employment conditions materially worsened almost immediately *after* she returned from her year-long medical leave. *Cf. Rubano*, 991 F. Supp. 2d at 700–01 (noting plaintiff's testimony "that the overall nature of the harassment was the same both before and

---

[14] Q: What made you think they didn't want to hear about how you were feeling physically or mentally?

A: Well, Valerie said, uh-huh, I'm not trying to hear all that. I don't want to hear nothing about your breast disease or what is going on, your cancer, that has nothing to do with me. . . (Jakomas Dep. at 44:9–15).

- 22 -

after he requested FMLA leave"). Nearly as soon as Plaintiff returned to work full-time, she began receiving formal and informal warnings about her conduct, saw a reduction in her responsibilities, was ordered to organize and clean the office, and was ordered to do so in order to "assess[] her skills." (VMR Dep. at 113:13–25, 115:13–15; *see also* Jakomas Dep. at 35:2–24). This action is particularly suspect because Plaintiff returned to work with no stated physical restrictions. (Def.'s SMF ¶ 12). Ostensibly the City, had it not "regarded" Plaintiff as "disabled," would have no reason to "assess" Plaintiff's capabilities for a job that she had been satisfactorily performing for a number of years prior. This "assessment," coupled with the reduction of Plaintiff's typical responsibilities and her supervisor's knowledge of Plaintiff's medical condition, raises a plausible inference that the City regarded Plaintiff as disabled. The narrow temporal gap in which the City took these actions is also a relevant consideration in determining whether a causal link exists. *See, e.g.*, *Warshaw v. Concentra Health Servs.*, 719 F. Supp. 2d 484, 496 (E.D. Pa. 2010) ("[A] fact-finder could reasonably conclude that adverse actions suffered by an employee shortly after an employer learns of the disability are, in fact, based on the employer's belief that the employee is limited in a major life activity.") (collecting cases); *accord Tirk v. Dubrook, Inc.*, No. 14-889, 2016 WL 427738, at *4 (W.D. Pa. 2016) (citing *Warshaw* favorably). The arguably severe formal disciplinary actions taken by the City occurred nearly contemporaneously with Plaintiff telling Debbie Lestitian and Valerie McDonald Roberts about her "breast disease" in March, 2015, and Plaintiff's employment was terminated only a few weeks later. Plaintiff has produced well more than a "mere scintilla" of evidence such that a reasonable factfinder could conclude that she was subjected to adverse employment actions because the City regarded her as being disabled in 2015. *See Anderson*, 477 U.S. at 252.

Accordingly, Plaintiff has established a prima facie case of ADA discrimination as to the alleged adverse employment actions that occurred after she returned to work in February, 2015.

## C. ADA Retaliation

### a. Legal standard

An employer may be liable under the ADA for retaliating against an employee that "made a charge, testified, assisted, or participated in any matter in an investigation, proceeding, or hearing" under the ADA. 42 U.S.C. § 12203(a). To prevail, a plaintiff must show a "(1) protected employee activity; (2) adverse action by the employer either after or contemporaneous with the employee's protected activity; and (3) a causal connection between the employee's protected activity and the employer's adverse action." *E.E.O.C. v. Allstate Ins. Co.*, 778 F.3d 444, 449 (3d Cir. 2015) (internal citations and quotations omitted). As with discrimination claims, retaliation claims under the ADA are analyzed under the *McDonnell Douglas* framework. *Moore v. City of Phila.*, 461 F.3d 331, 342 (3d Cir. 2006). If a plaintiff establishes a prima facie case of retaliation, "the burden shifts to the employer to advance a legitimate, non-retaliatory reason" for its conduct. *Id.* (quoting *Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 500–01 (3d Cir. 1997)). If the employer satisfies this burden, the plaintiff bears the burden of convincing the factfinder that the employer's proffered explanation was false and the true reason for the adverse employment action was retaliatory. *Id.*

An employee does not need to establish that she was—or was perceived to be—disabled to recover under a retaliation theory. *See Shellenberger v. Summit Bancorp, Inc.*, 318 F.3d 183, 188 (citing *Krouse*, 126 F.3d at 498). The plaintiff need only show that she suffered an adverse employment action because she engaged in a protected activity. *Id.* Filing a Charge of Discrimination with the EEOC is undeniably an activity protected by the ADA. *Shellenberger*,

318 F.3d at 188. As discussed above, Plaintiff has also established a material factual dispute as to whether she suffered additional adverse employment actions when her job duties were altered after she returned to work in February, 2015. The remaining issue is whether there is sufficient record evidence to raise an inference that the City took these adverse employment actions against Plaintiff because Plaintiff engaged in a protected activity.

### b. **Plaintiff has produced sufficient evidence to support an inference of causation.**

The City argues that Plaintiff is unable to establish a prima facie case of retaliation because Plaintiff is unable to prove causation. (Def. Br. at 19). Courts consider a "broad array of evidence" in determining whether there is a sufficient causal link between the protected activity and the employer's adverse action. *LeBoon v. Lancaster Jewish Comm. Ctr. Ass'n*, 503 F.3d 217, 232 (3d Cir. 2007) (citing *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 284 (3d Cir. 2000)). When the temporal proximity between the protected activity and adverse employment action is "unusually suggestive," it alone can be sufficient to create an inference of causation and defeat summary judgment. *LeBoon*, 503 F.3d at 232 (citing *Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273–74 (2001)). But, "[a]lthough there is no bright line rule as to what constitutes unduly suggestive temporal proximity, a gap of three months between the protected activity and the adverse action, without more, cannot create an inference of causation and defeat summary judgment." *Id.* at 233.

An employee need not prove that retaliation was the sole reason for the adverse employment action, rather, the employee must prove that it was a "determinative factor" in the employer's decision. *LeBoon*, 503 F.3d at 232 n.8 (citing *Watson v. S.E.P.T.A.*, 207 F.3d 207, 215 (3d Cir. 2000); *Caver v. City of Trenton*, 420 F.3d 243, 267 (3d Cir. 2005)). That is, the

employee must be able to prove that the employee's engaging in the protected activity was a "but-for cause" of the employer's adverse employment action. *LeBoon*, 503 F.3d at 232 n.8.

Here, about four months passed after Plaintiff filed her Charge of Discrimination with the EEOC in November, 2014, and the City's first disciplinary action in March, 2015. The City argues that, therefore, there must be additional evidence beyond that time interval to support an inference of causation. *See LeBoon*, 503 F.3d at 233.

First, as explained, a factual dispute exists whether Plaintiff began suffering adverse employment actions (in the form of changed job duties) as soon as she began working again in February, 2015. Second, the Court does not read *LeBoon* to establish a strict rule relating to time passage, as the City suggests. It is true that "a gap of three months . . . *without more*, cannot create an inference of causation." *LeBoon*, 503 F.3d at 232 n.8 (emphasis added). But the plaintiff in *LeBoon* had been regularly working for that entire time, *id.* at 222, making *LeBoon* distinguishable. And, the City mischaracterizes the temporal proximity between Plaintiff's protected activity and the adverse employment actions by including the final three months of Plaintiff's medical leave in its calculation. While it is true that four months elapsed between Plaintiff filing her Charge of Discrimination and the City's first disciplinary action, the reality is that Plaintiff's conditions of employment were adversely affected almost immediately after she resumed work.

In other words, there is "more" here to make the circumstances related to Plaintiff's protected activity and the employer response "unusually suggestive," as discussed above in relation to the discrimination claim. Nearly as soon as Plaintiff returned to work full-time, she began receiving formal and informal warnings about her conduct, saw a reduction in her responsibilities, and was ordered to organize and clean the office in order to "assess" her

capabilities. The City simply did not have the opportunity to take such actions while Plaintiff was on leave. Rather, the City engaged in this conduct almost as soon as it had the chance—once Plaintiff returned to work.

The Court also notes that the record is devoid of any other disciplinary actions taken against Plaintiff during her long-term employment with the City. What the record does establish is that Plaintiff faced markedly different employment conditions, arguably more stringent disciplinary rules, and arguably harsher enforcement of such requirements, as soon as she returned to work after her disability leave and her filing of a Charge of Discrimination. A reasonable factfinder could conclude that this connection is "unusually suggestive" of a retaliatory motive.

Ms. McDonald Roberts' alleged comments to Plaintiff and the EORC staff would also serve as further evidence of a retaliatory purpose or motive behind the City's actions. *See Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 281 (3d Cir. 2000) (holding that "causation can be inferred" in a retaliation case from "evidence gleaned from the record as a whole" and is "not limited to timing and demonstrative proof"). Plaintiff has produced record evidence to show that Ms. McDonald Roberts was persistently aware of Plaintiff's legal action against the City. Two weeks after Plaintiff filed her Charge of Discrimination in November, 2014, Ms. McDonald Roberts instructed Plaintiff's co-workers to cease all communication with Plaintiff because of the Charge. (Pl.'s CSF ¶ 47; VMR Dep. at 204:10–205:10, 326:19–327:10). At her deposition, Plaintiff recounts several instances of Ms. McDonald Roberts referencing her pending Charge in conversations with other City employees. (Jakomas Dep. at 35:3–14, 39:7–15, 42:10–19).[15] These comments and actions provide additional circumstantial support that Plaintiff's disparate

---

[15] For example, Plaintiff alleges Ms. McDonald Roberts "announced a lawsuit against me [sic] in front of numerous people and told me that I better have my act together before I stepped foot back in this door." (Jakomas Dep. at 35:11–14).

treatment following her medical leave was in retaliation for her filing a Charge of Discrimination.

In sum, a reasonable factfinder could infer that the reduction of Plaintiff's duties and responsibilities, discipline for violations of office policy, and eventual termination of employment, were, in fact, retaliatory actions taken by the City in response to Plaintiff filing a Charge of Discrimination with the EEOC in November, 2014. Thus, Plaintiff has produced sufficient evidence to establish a prima facie case of retaliation under the ADA.

### c. There is a material factual dispute as to whether the City's legitimate and non-discriminatory explanations of the adverse employment actions were pretextual.

Plaintiff has established prima facie cases of ADA discrimination (as to the 2015 events) and retaliation. Accordingly, applying the *McDonnell Douglas* framework, the Court must now determine if the City has met its burden to articulate a legitimate and non-discriminatory reason for the adverse employment actions. *See McDonnell Douglas*, 411 U.S. at 802; *see also Shellenberger*, 318 F.3d at 189 (internal citations omitted). The defendant's burden to articulate a legitimate, non-discriminatory reason is "relatively light: it is satisfied if the defendant articulates any legitimate reason for the [adverse employment action]; the defendant need not prove that the articulated reason actually motivated the [action]." *Shellenberger*, 318 F.3d at 189 (quoting *Krouse*, 126 F.3d at 500) (alterations in original).

A plaintiff then has the opportunity to prove that the employer's stated reasons were, in fact, pretext. 411 U.S. at 804. "[A] plaintiff may survive summary judgment . . . if the plaintiff produce[s] sufficient evidence to raise a genuine issue of fact as to whether the employer's proffered reasons were not its true reasons for the challenged employment action." *Sheridan v. E.I. DuPont de Nemours & Co.*, 100 F.3d 1061, 1067 (3d Cir. 1996) (*en banc*). This may be

- 28 -

demonstrated through direct or circumstantial evidence. *See Fuentes*, 32 F.3d at 764. And, "the nonmoving plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, incoherences, or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable factfinder could rationally find them unworthy of credence." *Jones*, 198 F.3d at 413 (quoting *Keller v. Orix Credit Alliance, Inc.*, 130 F.3d 1101, 1108 (3d Cir. 1997)). A plaintiff can also survive summary judgment by providing evidence that "allows the factfinder to infer that discrimination was more likely than not a motivating or determinative cause of the adverse employment action." *Fuentes*, 32 F.3d at 764. This could include evidence that the employer has treated similarly situated persons more favorably that than the plaintiff. *See id.* at 765.

The City claims that Plaintiff's duties were reduced when she returned to work in 2015 because these duties were absorbed by the Mayor's Office on January 1, 2014. (Def. Br. at 6). And, Plaintiff's "supervisory" duties were assumed by Ms. McDonald Roberts and then retained by her when Plaintiff returned from leave in 2015. The City's position is that this is a legitimate and non-discriminatory decision because the EORC had only three employees, including the Plaintiff, so it would be a reasonable decision to choose to have only one supervisor for the department. (Def. Br. at 7). The City also claims that Plaintiff was instructed to clean the EORC office because the office had recently moved and was disorganized. (VMR Dep. at 113:13–25). The City's primary explanation for why it fired Plaintiff was described above in relation to the Plaintiff's ADA discrimination claim, namely, that the City was perfectly justified in firing Plaintiff, an at-will employee, after an immediate record of insubordination that was addressed by progressive discipline. These justifications are all supported in the record. The City's burden to articulate legitimate and non-discriminatory reasons for the adverse employment actions is

"relatively light," and the Court concludes that that the City has more than met it here. *See Shellenberger*, 318 F.3d at 189.

However, several of the City's proffered explanations could be found to be sufficiently inconsistent so as to raise a genuine dispute of material fact regarding whether the City's justifications are pretextual and unworthy of belief. *See Sheridan*, 100 F.3d at 1067; *see also Shellenberger*, 318 F.3d at 190 (holding that inconsistent explanations by a supervisor over why an employee was fired created a factual dispute regarding whether the supervisor acted with a retaliatory animus). The City essentially argues that its hands were tied as a result of budget constraints and a new Administration assuming office. Because of these changes, there would be no more Manager position for Plaintiff to "fill in" for in 2014, and many of her supervisory duties would be redundant. But Plaintiff has produced enough evidence to cast doubt on this. Despite Ms. McDonald Roberts telling Plaintiff in early 2014 that the Manager position would be eliminated, Ms. McDonald Roberts requested permission to hire a new EORC manager in November, 2014. (Pl.'s CSF, Exh. S, ECF No. 86-21). This timing is suspiciously close to Plaintiff filing her Charge of Discrimination—and it could be argued that this suggests that the City was preparing to hire Plaintiff's replacement due to Plaintiff's Charge of Discrimination. Alternatively, since the request was made when Plaintiff was on medical leave, it could be argued that the City believed that Plaintiff would need to be replaced due to her medical condition. At minimum, it is an inconsistency in Ms. McDonald Roberts' actions that casts doubt on the City's explanation.

Also, a new Manager of Equity and Inclusion was hired shortly after Plaintiff was terminated from her position in April, 2015. (VMR Dep. at 52:5–53:12). This, once again, is arguably inconsistent with the City's claim that the position was eliminated from the budget and

that Plaintiff's duties were now redundant. The City argues that this position had broader duties than the Acting Manager position that Plaintiff held and that, to this day, the City still does not have a "Manager" position. (Def. Reply Br. at 4, ECF No. 93). But even if there is not a complete overlap in job responsibilities and title, a new employee was hired with the same or similar responsibilities that Plaintiff previously held, namely, managing the EORC. (VMR Dep. at 53:4–53:12). And, according to the City, no one was now needed to complete these duties because, either 1) they were absorbed by the Mayor's office or 2) Valerie McDonald Roberts had assumed them. Hiring a new employee to take over some of these duties would be facially inconsistent with that explanation. And, even Ms. McDonald Roberts stated in her deposition that she concluded at "the end of January 2015" (prior to Plaintiff returning from medical leave) that she (Ms. McDonald Roberts) had "too many responsibilities." (VMR Dep. at 54:23–25.). This could reasonably be found to contradict the City's explanation that Plaintiff's duties were reduced because they were redundant. If Ms. McDonald Roberts was already overworked before Plaintiff returned to work, it makes little sense that the City's response would be to *reduce* Plaintiff's job duties.

Plaintiff has also produced sufficient evidence to cast doubt on the City's explanation for why Plaintiff was tasked with cleaning the EORC offices, as was discussed in detail above. Suffice it to say, Ms. McDonald Roberts' admission that Plaintiff was tasked with cleaning the office in order to "assess" her skills (immediately after returning from an extended medical leave) is sufficiently suspect to call the City's explanation into question.

Plaintiff also takes issue with the severity of the punishment she received for what she argues are relatively minor violations of office policy. And while the Court acknowledges that Plaintiff was an at-will employee that did, admittedly, at times violate these policies, the Court

agrees that the punishment imposed for these events could be seen as inconsistent with the City's actions relative to another employee. A plaintiff can demonstrate that an illegitimate factor was more likely than not a motivation or determinative cause of the adverse employment action by demonstrating that the employer treated other, similarly situated employees more favorably. *Fuentes*, 32 F.3d at 765. Comparators must be "similarly situated in all respects" including having dealt with the same supervisor, being subjected to the same standards, and engaging in the same conduct. *E.g.*, *In re Tribune Media Co.*, No. 17-2449, at 30 (3d Cir. Sept. 5, 2018) (precedential). Another EORC employee—Kevin Pugh—also called off work unexpectedly due to an illness. (Pl.'s CSF, Exh. DD, ECF No. 86-32). Like Plaintiff, he was an employee in the five-member EORC office, was supervised by Valerie McDonald Roberts, and violated the EORC 's policy for calling off of work. Unlike Plaintiff, he was not punished nor asked to provide a medical excuse for that incident. (*Id.*). The City argues that circumstances between Mr. Pugh and Plaintiff were different enough to explain away the disparate treatment as a matter of law. (Def. Reply Br. at 9–10).[16] The Court disagrees. The City points out, and the record supports, that Mr. Pugh was disciplined for call-offs and other violations of office policy, but only once a pattern of violations emerged. (Def.'s App'x to Reply Br., Exh. 1 at 13–15, ECF No. 94-1). Further, the record indicates that Mr. Pugh never received more than a written warning and the threat of a one-day suspension for such violations. (*Id.*). Thus, there is a genuine factual dispute as to whether Mr. Pugh, a subordinate of Valerie McDonald Roberts and co-worker of Plaintiff, was treated more favorably for comparable violations of office policy.

---

[16] The City argues that Mr. Pugh was not asked for a written excuse because, unlike Plaintiff, Kevin Pugh did not have a history of calling off and complied with the office call-off procedure on the day in question. (Def. Reply Br. at 9–10). The City further argues that it began to progressively suspend Mr. Pugh in a similar manner to Plaintiff when Mr. Pugh continued to call off of work. (*Id.*).

## IV. CONCLUSION

For the foregoing reasons, the City's Motion for Summary Judgment is GRANTED IN PART and DENIED IN PART. The Motion is GRANTED as to the portion of Plaintiff's ADA discrimination claim regarding the City's decision, in 2014, to revert Plaintiff to her permanent employment position. Summary judgment is GRANTED in the City's favor as to all claims arising out of the City's actions prior to Plaintiff returning to work in February, 2015. The Motion is otherwise DENIED WITHOUT PREJUDICE.

An appropriate Order will issue.

Mark R. Hornak
United States District Judge

Dated: October 24, 2018

cc: All Counsel of Record